(Slip Opinion)

# Temporary Certification Under the President John F. Kennedy Assassination Records Collection Act of 1992

Section 5(g)(2)(D) of the President John F. Kennedy Assassination Records Collection Act of 1992 authorizes the President to issue a temporary certification postponing disclosure of a set of records without articulating record-specific justifications for further postponement of each individual record. The purpose of this postponement would be limited to providing sufficient time to resolve which specific records warrant postponement under section 5(g)(2)(D). There is a strong likelihood that many of the records in question implicate the kinds of sensitivities about national security, law enforcement, and foreign affairs contemplated by the statute.

Serious constitutional concerns would arise if the Act were construed to require the President to make premature disclosures of records while they are likely to contain still-sensitive information.

October 26, 2017

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

Under the President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, 106 Stat. 3443 (codified as amended at 44 U.S.C. § 2107 note) ("JFK Act" or "the Act"), approximately 34,000 records relating to President Kennedy's assassination that have not previously been disclosed in full or in part to the public are to be released by October 26, 2017, unless the President certifies that their release would present identifiable harm that outweighs the public's interest in disclosure. *See* JFK Act § 5(g)(2)(D). In an October 12, 2017 memorandum, the Archivist of the United States expressed "significant concerns" about the manner in which certain federal agencies had applied that standard in their proposals for postponing the release of some of their records beyond that deadline. Memorandum for the President, from David S. Ferriero, Archivist of the United States, *Re: Concerns Regarding Agency Proposals to Postpone Records Pursuant to Section 5 of the President John F. Kennedy Assassination Records Collection Act of 1992 (JFK Act)* at 1 (Oct. 12, 2017) ("Archivist Memorandum"). Although the Archivist acknowledged that legitimate sensitivities "could warrant continued postponement" of some of these records under the Act, he concluded that "there is insufficient time for [the National Archives and Records Administration ("NARA")] and the pertinent agencies to . . . identify those certain, specific instances" in which continued postponement is appropriate. *Id.* at 1, 2.

You have asked whether section 5(g)(2)(D) of the Act allows the President to issue a temporary certification postponing disclosure of a set of records without articulating record-specific justifications for further postponement of each individual record. The purpose of this postponement would be limited to providing sufficient time to resolve which specific records warrant postponement under section 5(g)(2)(D). Under the circumstances, in which the initial postponement would last for only a few months and there is a strong likelihood that many of the records in question implicate the kinds of sensitivities about national security, law enforcement, and foreign affairs contemplated by the statute, we conclude that section 5(g)(2)(D) authorizes the President to make such a certification.

## I.

### A.

The Act mandates that governmental entities with records relating to the assassination of President Kennedy collect, review, and transfer those records to the President John F. Kennedy Assassination Records Collection ("JFK Collection") maintained by NARA. *See* JFK Act §§ 2(a)(1), 4, 5(a). Approximately 272,000 records have already been released in full under the Act. *See* Memorandum for John A. Eisenberg, Legal Adviser to the National Security Council, from John P. Fitzpatrick, Senior Director for Records, Access and Information Security Management, National Security Council, *Re: Department and Agency Requests for Continued Postponement of Records under the JFK Assassination Records Collection Act* at 1 (Oct. 25, 2017) ("NSC Memorandum"). As relevant now, the Act provides that each yet-to-be-released assassination record "shall be publicly disclosed in full" and made "available in the [JFK] Collection" by October 26, 2017, "unless the President certifies" that "an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations" necessitates continued postponement of disclosure and "outweighs the public interest in disclosure." JFK Act § 5(g)(2)(D).[1]

The Act defines an "assassination record" as "a record that is related to the assassination of President John F. Kennedy, that was created or made

---

[1] We assume without deciding that the President's certification power under section 5(g)(2)(D) is not delegable.

available for use by, obtained by, or otherwise came into the possession of" various governmental entities. *Id*. § 3(2). In 1995, the Assassination Records Review Board ("Board")—a short-lived agency established by the Act, *see id*. § 7—issued regulations interpreting "assassination record" broadly, to encompass "[a]ll records collected by or segregated by all Federal, state, and local government agencies in conjunction with any investigation or analysis of or inquiry into the assassination of President Kennedy." 36 C.F.R. § 1290.1(b)(2). Under the Board's interpretation, "assassination record[s]" include documents created well into the 1990s pertaining to investigations, analyses, or inquiries into President Kennedy's assassination.[2]

The Act gave federal offices until late 1993 to identify and review all assassination records in their possession and to begin transferring them to NARA for immediate public release. *See* JFK Act § 5(c)(1). The Act, however, also established an exception under section 6, which allowed public disclosure to be postponed up to October 26, 2017. A postponement under section 6 required "clear and convincing evidence that" the record in question implicated (1) certain sensitive information whose disclosure would threaten national security or foreign affairs; (2) living individuals who provided confidential information and would face a substantial risk of harm if their identities were revealed; (3) unwarranted intrusions into personal privacy; (4) confidential understandings between United States agents and cooperating individuals or foreign governments that would be compromised and cause harm if publicly revealed; or (5) security or protective procedures that the government uses or might use, where disclosure of those procedures would be sufficiently harmful.[3]

---

[2] Conducting an "Expert Search" of the JFK Collection Reference System for records dated between 1990 and 1998 returns nearly 5,000 records. *See* NARA, *JFK Assassination Records, Collection Reference System*, https://www.archives.gov/research/jfk/search.html (last visited Oct. 26, 2017).

[3] More specifically, section 6 authorizes postponement of public disclosure of records or portions of records only when

there is clear and convincing evidence that—

(1) the threat to the military defense, intelligence operations, or conduct of foreign relations of the United States posed by the public disclosure of the assassination record is of such gravity that it outweighs the public interest, and such public disclosure would reveal—

(A) an intelligence agent whose identity currently requires protection;

The Board reviewed every record that a "[g]overnment office" identified as subject to postponement of disclosure under section 6 and made its own determination whether the record qualified as an "assassination record" and whether postponement was warranted. *See id*. § 7(i)(2). The Board began its work in April 1994 and ceased operating on September 30, 1998. *See Final Report of the Assassination Records Review Board* at 13, 15 (Sept. 30, 1998) ("*ARRB Report*"), https://www.archives.gov/files/research/jfk/review-board/report/arrb-final-report.pdf. In many cases, the Board appears not only to have upheld the postponement of disclosure but also to have concluded that postponement until 2017 was warranted. *See id*. at 30 ("[T]he Review Board employs the term 'postponed' to mean 'redacted until the year 2017.'"); *see generally id*. at 48–74 (identifying various types of records as "postponed"; explicitly identifying certain types of records as postponed for shorter periods of time when appropriate). The Act also allowed agencies to appeal the Board's determinations to the President, who was to issue a written certification specifying his

---

    (B) an intelligence source or method which is currently utilized, or reasonably expected to be utilized, by the United States Government and which has not been officially disclosed, the disclosure of which would interfere with the conduct of intelligence activities; or

    (C) any other matter currently relating to the military defense, intelligence operations or conduct of foreign relations of the United States, the disclosure of which would demonstrably impair the national security of the United States;

    (2) the public disclosure of the assassination record would reveal the name or identity of a living person who provided confidential information to the United States and would pose a substantial risk of harm to that person;

    (3) the public disclosure of the assassination record could reasonably be expected to constitute an unwarranted invasion of personal privacy, and that invasion of privacy is so substantial that it outweighs the public interest;

    (4) the public disclosure of the assassination record would compromise the existence of an understanding of confidentiality currently requiring protection between a Government agent and a cooperating individual or a foreign government, and public disclosure would be so harmful that it outweighs the public interest; or

    (5) the public disclosure of the assassination record would reveal a security or protective procedure currently utilized, or reasonably expected to be utilized, by the Secret Service or another Government agency responsible for protecting Government officials, and public disclosure would be so harmful that it outweighs the public interest.

JFK Act § 6. Although section 6 itself does not limit postponements to October 26, 2017, section 5(g)(2)(D) requires that postponed records "be publicly disclosed in full" by that date unless the President certifies a further postponement under a different standard.

determination "under the standards set forth in section 6" whether to postpone or disclose a record. JFK Act § 9(d)(1).

Even when the Board found that an assassination record qualified for a postponement under section 6, the Act thereafter required periodic review "by the originating agency and the Archivist" of whether the justifications for postponement remained valid. *See id*. § 5(g)(1)–(2). Under this process, many records that previously qualified for postponement of disclosure under section 6 have already been released. Most recently, in July 2017, NARA released "3,810 documents, including 441 formerly withheld-in-full documents and 3,369 documents formerly released with portions redacted," originating from the Federal Bureau of Investigation and the Central Intelligence Agency. NARA, *JFK Assassination Records – 2017 Additional Documents Release*, https://www.archives.gov/research/jfk/2017-release (last visited Oct. 26, 2017).

While approximately 272,000 assassination records have already been released in full, approximately 34,000 documents have yet to be disclosed, in whole or in part, because they have continued to satisfy section 6. NSC Memorandum at 1, 2. In other words, federal agencies identified these records as being subject to postponed disclosure under section 6, the Board confirmed that "clear and convincing evidence" established that one of the section 6 criteria applied, and the Act required periodic re-review to confirm that postponed disclosure remained justified. "Over 90% of the remaining postponed records originated from or contain equities of the Central Intelligence Agency or the Federal Bureau of Investigation." *Id*. at 2 n.5.

In light of section 5(g)(2)(D), the authority to withhold assassination records under section 6 expires on October 26, 2017. At that point, each remaining record "shall be publicly disclosed in full . . . unless the President certifies" that continued postponement is necessary to protect against identifiable harm to national security, law enforcement, or foreign affairs, and that the harm outweighs the public interest in disclosure. JFK Act § 5(g)(2)(D).

## B.

When President George H.W. Bush signed the Act in 1992, he issued a signing statement—consistent with this Office's recommendation[4]—

---

[4] *See* Memorandum for W. Lee Rawls, Assistant Attorney General, Office of Legislative Affairs, from David G. Leitch, Deputy Assistant Attorney General, Office of Legal

explaining that section 6 is unduly restrictive because it "does not contemplate nondisclosure of executive branch deliberations or law enforcement information of the executive branch . . . , and it provides only a narrow basis for nondisclosure of national security information." Statement on Signing the President John F. Kennedy Assassination Records Collection Act of 1992 (Oct. 26, 1992), 2 *Pub. Papers of Pres. George Bush* 2004, 2004–05 (1992–93) ("1992 Signing Statement"). He further explained that the President's "authority to protect these categories of information comes from the Constitution and cannot be limited by statute," and that the President "cannot abdicate [his] constitutional responsibility to take such action when necessary." *Id*. at 2004.

## C.

Between September 2014 and November 2015, NARA sent notices to all agencies that still had records or portions of records postponed under section 6, reminding them of the Act's October 26, 2017 disclosure deadline. *See* NSC Memorandum at 3. The National Security Council's Records Access and Information Security Interagency Policy Committee instructed each affected agency to provide by May 1, 2017, a memorandum either advising that it was not asking the President to certify under section 5(g)(2)(D) that continued postponement of records was necessary, or requesting continued postponement and supplying justifications that would support presidential certification. *Id*. at 3–4. The agencies have requested that the President certify that it is necessary to continue postponing the disclosure, either in whole or in part, of approximately 31,000 records. *Id*. at 4.

In recent months, subject-matter experts at NARA reviewed the agencies' requests and raised concerns with National Security Council staff about whether the agencies had complied with the statutory standard. As noted above, on October 12, 2017, the Archivist of the United States wrote to the President of his "significant concerns" about the proposed postponements. Archivist Memorandum at 1. In light of "the information at issue and the related sensitivities," the Archivist "agree[d]" that the records "could warrant continued postponement in certain, specific in-

---

Counsel, *Re: Enrolled Bill S. 3006, President John F. Kennedy Assassination Records Collection Act*, att. at 1–2 (Oct. 6, 1992) (recommending that the President "make clear that the bill cannot restrict the President's authority under the Constitution to protect confidential information").

stances." *Id.* Based on NARA's review of a sampling of postponed records, however, the Archivist expressed doubt that agencies had properly applied the standard for postponing disclosure under section 5(g)(2)(D) in every instance. The Archivist also expressed the view that inconsistencies existed between the agencies' current requests for postponing disclosure of certain information and prior instances in which the same information had been disclosed. Accordingly, the Archivist concluded that "there is insufficient time for NARA and the pertinent agencies to further consider our concerns and identify those certain, specific instances where information could warrant continued postponement." *Id.* at 2.

## II.

You have asked whether the Act permits the President to make a temporary certification that would postpone disclosure of a large number of the remaining undisclosed records (or portions of records) to enable completion of the full review contemplated by the Archivist. You expect the process of resolving the Archivist's concerns and making the necessary determinations to require an additional six months beyond the October 26, 2017 statutory deadline. For the reasons that follow, we conclude that section 5(g)(2)(D) of the Act authorizes the President to certify the short-term postponement you describe.

## A.

The Act requires public disclosure of all remaining assassination records by October 26, 2017, unless the requisite certification is made. In relevant part, it provides as follows:

> Each assassination record shall be publicly disclosed in full, and available in the Collection no later than the date that is 25 years after the date of enactment of this Act [Oct. 26, 1992], unless the President certifies, as required by this Act, that—
>
>> (i) continued postponement is made necessary by an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations; and
>>
>> (ii) the identifiable harm is of such gravity that it outweighs the public interest in disclosure.

JFK Act § 5(g)(2)(D). We conclude that the certification you propose would satisfy the balancing test in section 5(g)(2)(D). As explained more

fully below, the President could reasonably determine that a short-term postponement is necessary because a premature release of records without adequate time to resolve agencies' concerns would present an identifiable harm to the interests identified in clause (i). Furthermore, he could reasonably determine that the public interest in immediate disclosure does not outweigh the identifiable harm because disclosures would be postponed for, at most, six months.

### 1.

Such a certification would satisfy section 5(g)(2)(D) even though the President would be determining that a group of records collectively warrants continued postponement. Section 5(g)(2)(D), in our view, does not require the President to articulate record-specific justifications for further postponement of each individual record. Although section 5(g)(2)(D) requires that "[e]ach assassination record" withheld until 2017 "shall be publicly disclosed in full" unless the President makes the necessary certification, that provision is silent as to whether the President must make a certification regarding each individual record, or whether he may make a certification applicable to a group of withheld records that raises an identifiable harm. In the absence of specificity on this point, we believe that section 5(g)(2)(D) gives the President discretion to issue a certification postponing disclosure of an entire group of records.

Language in sections 6 and 9 of the Act reinforces the conclusion that the contrasting language in section 5(g)(2)(D) does not require the President to determine that each individual record (or portion of a record), considered in isolation, would pose an identifiable harm outweighing the public interest in disclosure. All of these provisions set forth criteria for postponing the disclosure of records. Within section 6, which defines the threshold criteria that supported withholding records up until now, every subsection demands an assessment of whether "the public disclosure *of the assassination record*" would cause particular harms. JFK Act § 6(1), (2), (3), (4), & (5) (emphasis added). For instance, section 6(1) requires that "the threat to the military defense, intelligence operations, or conduct of foreign relations . . . posed by the public disclosure of the assassination record [be] of such gravity that it outweighs the public interest." Similarly, section 9(c), which specifies the Board's process for reviewing agencies' determinations that records satisfy section 6, commands the Board to review each assassination record individually before making "a determination that *an assassination record* shall be publicly disclosed in the Collec-

tion or postponed for disclosure." *Id*. § 9(c)(4)(A) (emphasis added); *see id*. § 9(c)(1)(A)–(B) (the Board must direct public disclosure unless "a Government record is not an assassination record" or "a Government record or particular information within an assassination record qualifies for postponement"); *id*. § 9(c)(2) (setting forth requirements for "approving postponement of public disclosure of an assassination record"). And section 9(d), which authorizes the President to issue a certification approving or disapproving the Board's decision, similarly requires the President to apply the section 6 criteria separately to each record to determine whether postponement is warranted. *See id*. § 9(d)(1) ("After the Review Board has made a formal determination concerning the public disclosure or postponement of disclosure of an executive branch assassination record or information within such a record . . . the President shall have the sole and nondelegable authority to require the disclosure or postponement of such record or information under the standards set forth in section 6[.]").

Section 5(g)(2)(D)(i), however, uses very similar language to section 6(1) in describing "an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations," without expressly tying that harm to an individual assassination record. These textual differences indicate that section 5(g)(2)(D) authorizes the President to certify that it is necessary to withhold an entire group of records the disclosure of which would present an identifiable harm outweighing the public interest in disclosure. *See Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) ("We have long held that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks and brackets omitted).

This reading also reflects sensible policy aims. By the time the President determines whether to continue to postpone records under section 5(g)(2)(D), each record has gone through an extensive and individualized multi-year review process to verify that public disclosure would have been harmful in the 1990s and would still be harmful through October 26, 2017. That history explains why Congress would have afforded the President additional flexibility when determining the necessity of postponing disclosure beyond 2017. The different timetables for review under section 6 and section 5(g)(2)(D) bolster this conclusion. By design, the section 6 process took years and multiple stages of review—including the possibility of presidential review—to resolve which individual records

should be withheld. Congress could have concluded that the President's review under section 9(d)(1) of the Board's determinations about individual records would not interfere with the President's core duties, since any appeals would likely be staggered in time and most Board determinations would not demand presidential action. Section 5(g)(2)(D), on the other hand, requires the President to make determinations about all remaining postponed records in a very short timeframe, because he must determine whether postponement remains necessary in light of current concerns about national security, law enforcement, and foreign affairs. If the President were barred from determining that a group of records collectively warranted continued postponement, he would be forced to evaluate the individual justifications for postponing tens of thousands of records on a compressed timetable without adequate time for full consideration. Policy concerns thus support interpreting section 5(g)(2)(D) to allow the President to issue a certification encompassing multiple records.

We further conclude that the proposed certification would satisfy the requirement of section 5(g)(2)(D)(i) that there be "an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations." An "identifiable harm" to national security, law enforcement, or foreign affairs includes the potential harm to those interests resulting from prematurely disclosing a batch of records that appears to contain sensitive information. The ordinary meaning of "identifiable" is "[a]ble to be identified; capable of identification." 7 *Oxford English Dictionary* 618 (2d ed. 1989); *see also, e.g.*, *Random House Dictionary of the English Language (Unabridged)* 950 (2d ed. 1987) (defining "identify" as "[t]o recognize or establish as being a particular person or thing"). And the ordinary meaning of "harm" in this context is "injury" or "damage." 6 *Oxford English Dictionary* at 1121. Thus, an "identifiable harm" under section 5(g)(2)(D)(i) involves the type of damage to national security, law enforcement, or foreign affairs that could be articulated or ascertained.

Textual differences between sections 6, 9(d)(1), and 5(g)(2)(D) support the conclusion that section 5(g)(2)(D) authorizes continued postponement based on broad but recognizable harms. Specific language in section 6 expressly compels the government both to identify why disclosure would present particularized harms to national security, law enforcement, or foreign affairs and also to substantiate that such harms would materialize. For instance, section 6(1) does not just require that "the threat to the military defense, intelligence operations, or conduct of foreign relations

. . . posed by . . . public disclosure . . . [be] of such gravity that it out-weighs the public interest." JFK Act § 6(1). It also demands evidence that public disclosure (A) would specifically threaten the identity of an intelli-gence agent who "requires protection," (B) would "interfere with the conduct of intelligence activities" by compromising intelligence sources or methods that the United States presently used or was likely to use, or (C) "would demonstrably impair the national security of the United States." *Id.* Similarly, under section 9(d)(1), if the President wishes to reverse a Board determination to disclose or postpone a record, he must not only apply "the standards set forth in section 6," but must also issue "an unclassified written certification . . . stating the justification for the President's decision, including the applicable grounds for postponement under section 6."

Under section 5(g)(2)(D), by contrast, the President need only certify that "continued postponement is made necessary by an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations," and that "the identifiable harm is of such gravity that it outweighs the public interest in disclosure." Section 5(g)(2)(D) contains no additional specifications of the types of harms that would warrant postponing disclosure. Nor does it compel the President to describe which specific grounds necessitate postponement. Those differ-ences from the earlier process are strong evidence that Congress intended section 5(g)(2)(D) to be a less exacting standard that would not require the President to pinpoint specific instances of harm that could arise from disclosure. For the reasons noted above, there are also convincing policy reasons why Congress would have chosen to make section 5(g)(2)(D) less stringent than sections 6 and 9 in these regards.

Nor, in our view, does section 5(g)(2)(D) require evidentiary proof sub-stantiating the likelihood that disclosing a record would cause "identifia-ble harm." Section 5(g)(2)(D) merely provides that the President must certify that it is "necessary" to postpone disclosure in light of an "identifi-able harm," not that the President must establish that such harm would occur. By contrast, section 6 requires evidence that disclosing an intelli-gence source or method "would interfere with the conduct of intelligence activities," *id.* § 6(1)(B), or that disclosing other sensitive information "would demonstrably impair the national security of the United States," *id.* § 6(1)(C). Those showings, like others under section 6, must be sup-ported by "clear and convincing evidence." *Id.* § 6. In other statutes, too, Congress has specified the necessary level of certainty that harm to na-

tional security will occur. *See, e.g.*, 50 U.S.C. § 1885a(c) (requiring the Attorney General to certify that disclosure of certain materials in litigation "would harm the national security of the United States"); *id*. § 1845 (requiring the Attorney General to certify that disclosure of evidence derived from the use of a pen register or trap-and-trace device "would harm the national security of the United States"); *id*. § 2656 (requiring the Secretary of Energy to notify Congress of intelligence losses deemed "likely to cause significant harm or damage to the national security interests of the United States"). The fact that Congress did not specify in section 5(g)(2)(D) the degree of likelihood that disclosure would harm national security, law enforcement, or foreign affairs suggests that Congress authorized the President to determine what level of risk necessitates postponing disclosure.[5]

Thus, for purposes of the first half of section 5(g)(2)(D)'s balancing test, the President may reasonably conclude that the premature disclosure of the records at issue would present "an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations." JFK Act § 5(g)(2)(D)(i). Courts have long recognized that forcing the Executive Branch to disclose sensitive information can harm national security, law enforcement, or foreign affairs.[6]

---

[5] We recognize that section 5(g)(2)(D) refers to an "identifiable *harm* to the military defense, intelligence operations, law enforcement, or conduct of foreign relations," whereas section 6(1) instead refers to a "*threat* to the military defense, intelligence operations, or conduct of foreign relations" (emphases added). While a "harm" is an "injury" and a "threat" generally refers to the prospect of an impending injury, "harm" in the present context is necessarily a prediction of what injury may occur after disclosure. We do not believe that Congress's use of the term "harm" in section 5(g)(2)(D) implies that this predicted injury must be more certain to occur than the "threats" described in section 6. Rather, as noted above, Congress in section 6 and other statutes appears to have deliberately required the Executive Branch to specify a particular degree of likelihood or certainty about a future harm, yet declined to add any such language to section 5(g)(2)(D).

[6] *See CIA v. Sims*, 471 U.S. 159, 175–77 (1985) ("[F]orced disclosure of the identities of [the CIA's] intelligence sources could well have a devastating impact on the Agency's ability to carry out its mission" and "[d]isclosure of the subject matter of the Agency's research efforts and inquiries may compromise the Agency's ability to gather intelligence as much as disclosure of the identities of intelligence sources."); *Snepp v. United States*, 444 U.S. 507, 511–12 (1980) (per curiam) (disclosure of even unclassified information "can be detrimental to vital national interests" by "reveal[ing] information that the CIA— with its broader understanding of what may expose classified information and confidential sources—could have identified as harmful"); *Haig v. Agee*, 453 U.S. 280, 307–08 (1981) ("foreign policy and national security considerations cannot neatly be compartmental-

Moreover, the risk that the yet-to-be-released assassination records include sensitive information is not speculative. These records have previously and reliably been found to contain sensitive information about national security, law enforcement, or foreign affairs, making it highly likely that their release would present the harm identified in section 5(g)(2)(D)(i). Disclosure of each of these records has already been postponed on the ground that the withheld information satisfied one of section 6's standards, which overlap considerably with the interests protected by section 5(g)(2)(D)(i). For example, for a record to have been protected from disclosure until 2017 under section 6(2), there had to be "clear and convincing evidence" that disclosure would risk substantial harm to a living confidential informant by revealing his or her identity and that this harm outweighed the public interest in disclosure. If that informant is alive today, disclosure would still likely pose "an identifiable harm to . . . law enforcement." JFK Act § 5(g)(2)(D)(i).[7] The examples of records that

---

ized," and "[s]ecrecy in respect of information gathered by [diplomatic officials] may be highly necessary, and the premature disclosure of it productive of harmful results") (internal quotation marks omitted); *Halkin v. Helms*, 690 F.2d 977, 993 (D.C. Cir. 1982) ("[I]t is obvious that the exposure of one who acted—and indeed may still be acting—as a CIA operative here and abroad would pose a threat to our diplomatic and military interests."); *Roviaro v. United States*, 353 U.S. 53, 59 (1957) (recognizing "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law" and noting that the "purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement"); *United States v. Ortega*, 854 F.3d 818, 824 (5th Cir. 2017) (citing *Roviaro*); *Smith v. Lanier*, 726 F.3d 166, 167 (D.C. Cir. 2013) (same).

[7] To be sure, the section 6 categories are not wholly subsumed within the section 5(g)(2)(D) standard. Section 6(3)—covering records whose disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy"—does not have an obvious analogue in section 5(g)(2)(D). But that is a relatively minor concern, as very few of the remaining postponements were made under section 6(3). *See ARRB Report* at 63 (noting that the Board "almost never agreed to sustain [an] agency's requests for postponements on personal privacy grounds"); *id*. at 64 (noting that certain prisoner-of-war information was postponed under section 6(3), but only until 2008). Of the privacy postponements that remain in effect, some may still fall within one of the categories identified in section 5(g)(2)(D)(i). For example, the Board "agreed to sustain the postponement of the identity of a 13-year-old girl who was a rape victim . . . in the file of an organized crime figure." *Id*. at 63. The President could still find that the continued postponement of this sort of information is necessary to prevent identifiable harm to law enforcement sufficient to meet section 5(g)(2)(D)(i). Such a finding would be consistent with part of the "oft-cited *Frankenhauser* test" for the law enforcement component of executive privilege, which asks courts to consider, among other factors, "the extent to

the Board deemed eligible for postponement under section 6 underscore this point. For instance, the Board authorized postponing disclosure of records containing "CIA surveillance methods where CIA provided convincing evidence that the method still merited protection." *ARRB Report* at 53. It is reasonable to conclude that disclosing such a method now could still present "an identifiable harm to . . . intelligence operations." JFK Act § 5(g)(2)(D)(i). More generally, NARA's independent review of a sampling of the records at issue concluded that many still contain highly sensitive information. *See* Archivist Memorandum at 1 ("We are familiar with the information at issue and the related sensitivities and agree that they could warrant continued postponement in certain, specific instances."). And in the absence of further interagency coordination and review, it is not yet possible to determine which specific records would warrant continued postponement of disclosure.

## 2.

We also believe that it would be reasonable for the President to conclude that the identifiable harm from premature disclosure of such records would, as section 5(g)(2)(D)(ii) requires, be "of such gravity that it outweighs the public interest in disclosure."

Importantly, the proposed postponement would last only a few more months. As a result, the relevant public interest consists only in the difference between having disclosures occur now and having disclosures occur within the next six months. That interest weighs comparatively little in the statutory balance, especially in the wake of fully authorized postponements of decades.[8] The public interest in full access to assassination records is significant. But a temporary delay in disclosure would still allow that interest to be vindicated fairly soon; in contrast, disclosure of

---

which disclosure will thwart governmental processes by discouraging citizens from giving the government information." *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 570 (5th Cir. 2006) (quoting *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D. Pa. Mar. 13, 1973) (unpublished)); *see also, e.g.*, *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1166 (3d Cir. 1995) (protecting the withholding of names of "law enforcement officers, interviewees, and witnesses" because of the possibility of "harassment and retaliation").

[8] Accounting for the length of the proposed postponement is consistent with the Board's analysis under section 6 of whether particular types of risks from disclosure outweighed the public interest. *See, e.g.*, *ARRB Report* at 64 (postponing until 2008 the release of private details from prisoner-of-war records from the Korean conflict, based on the expected lifespan of affected individuals).

sensitive information would compromise other important interests irrevocably. In our view, the concrete risk of harm that premature disclosure of sensitive records would pose to national security, law enforcement, and foreign affairs clearly outweighs the public interest in accessing these records up to six months earlier.

It could of course be said that the government has already had 25 years to review the records at issue, and that the public interest in disclosure after the Act's statutory deadline should outweigh the Executive's need for still more time to assess these records. But that argument misapprehends the review process, as well as the Act's different standards for delaying the disclosure of records before and after October 26, 2017. As noted, the records at issue have already been repeatedly reviewed. Thus far, the Act has required the government to satisfy section 6's criteria for delaying disclosure of each record. As part of that process, the Board confirmed that records could remain exempt from disclosure until October 26, 2017. After that date, however, the government must instead rely on a certification under section 5(g)(2)(D) that continued postponement is necessary. But during the certification review process, NARA's questions about other agencies' applications of section 5(g)(2)(D) have prevented the Executive Branch from definitively resolving which remaining records can continue to be withheld. Nor would it have been feasible to begin reviewing records under the section 5(g)(2)(D) standard much earlier. The further in advance of 2017 that agencies tried to apply section 5(g)(2)(D), the greater the risk of inaccurately assessing whether disclosure in 2017 would risk an identifiable harm to national security, law enforcement, or foreign affairs.

## B.

Principles of constitutional avoidance strongly support our conclusion that section 5(g)(2)(D) authorizes the President to postpone temporarily the full disclosure of the records at issue. *See, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Serious constitutional concerns would arise if the Act were construed to require the President to make premature disclosures of records while they are likely to contain still-sensitive information.

The President's position as "head of the Executive Branch and as Commander in Chief" confers upon him the "authority to classify and control access to information bearing on national security"—an authority that "exists quite apart from any explicit congressional grant." *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988). Courts accordingly "show[] deference to what the Executive Branch has determined . . . is essential to national security." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (internal quotation marks omitted); *see also Egan*, 484 U.S. at 529 (finding that "the protection of classified information must be committed to the broad discretion of the agency responsible," and declining to "determine what constitutes an acceptable margin of error in assessing the potential risk" of improper access or disclosure). The Supreme Court has similarly emphasized "the generally accepted view that foreign policy [is] the province and responsibility of the Executive," and that "courts have traditionally shown the utmost deference to Presidential responsibilities" in that area. *Id*. at 530 (internal quotation marks and citations omitted).

Opinions by Attorneys General and this Office have repeatedly recognized the President's authority and responsibility to protect against the release of information affecting the Executive Branch's intelligence activities, military operations, conduct of foreign affairs, or law enforcement proceedings, even in the face of statutory disclosure requirements. *See, e.g.*, *Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92, 95 (1998) (discussing "the right of the President to decide to withhold national security information from Congress under extraordinary circumstances"); *Presidential Certification Regarding the Provision of Documents to the House of Representatives Under the Mexican Debt Disclosure Act of 1995*, 20 Op. O.L.C. 253, 265–76 (1996) (discussing the "President's constitutional authority to control the disclosure of documents and information relating to diplomatic communications"); *Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 35 (1982) (opinion of Attorney General William French Smith) ("[I]f the President believes that certain types of information in law enforcement files are sufficiently sensitive that they should be kept confidential, it is the President's constitutionally required obligation to make that determination."); *see also Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 140 (1984) ("Nearly every President since George Washington has found that in order to perform his constitutional duties it is necessary to protect the confidentiality of certain materials, including . . . national security information[]

and sensitive law enforcement proceedings, from disclosure to Congress."). Those opinions are consistent with President Bush's determination that the Act's disclosure requirement could not be allowed to interfere with the President's constitutional authority to "protect confidential executive branch materials and to supervise and guide executive branch officials." 1992 Signing Statement at 2005.

One necessary incident of the President's authority to control sensitive executive branch information is the ability to determine in the first instance which records contain such information. Thus, construing section 5(g)(2)(D) to deprive the President of the ability to withhold records in order to give the Executive Branch adequate time to determine which records contain still-sensitive information about national security, law enforcement, or foreign affairs would impermissibly encroach upon a core presidential prerogative. In an analogous circumstance, when it had not been possible to review a large set of documents in the time allowed by a congressional subpoena, Attorney General Janet Reno concluded that a protective assertion of executive privilege was appropriate, pending final decisions about "which specific documents are deserving of a conclusive claim of executive privilege." *Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1, 1 (1996). There, the protective assertion was necessary because the volume of documents could not be "specifically and individually reviewed" within the time available. *Id.* Here, too, the Archivist has concluded that it is not possible within the time available to resolve remaining questions regarding whether individual records still contain sensitive information.

As we have explained, "[w]here the President's authority concerning national security or foreign relations is in tension with a statutory rather than a constitutional rule, the statute cannot displace the President's constitutional authority and should be read to be 'subject to an implied exception in deference to such presidential powers.'" *Title III Electronic Surveillance Material and the Intelligence Community*, 24 Op. O.L.C. 261, 274 (2000) (quoting *Rainbow Navigation, Inc. v. Dep't of the Navy*, 783 F.2d 1072, 1078 (D.C. Cir. 1986) (Scalia, J.)); *see also, e.g.*, *Presidential Certification Under the Mexican Debt Disclosure Act*, 20 Op. O.L.C. at 264 (finding that constitutional avoidance required a particular construction of a statute "because any other reading would fail to preserve the President's constitutional authority and responsibility to preserve the absolute confidentiality of documents the disclosure of which would be contrary to the public interest"); *Prosecution for Contempt of Congress*,

8 Op. O.L.C. at 139–41 (concluding, in light of the Executive's sole authority over law enforcement, that "the constitutionally mandated separation of powers requires the [criminal-contempt-of-Congress] statute to be interpreted so as not to apply to Presidential assertions of executive privilege"). Accordingly, principles of constitutional avoidance require interpreting the Act to authorize the President to postpone the disclosure of the records at issue on a temporary basis.

## III.

For the reasons set forth above, we conclude that section 5(g)(2)(D) of the Act authorizes the President to issue a temporary certification postponing the full disclosure of certain undisclosed records in the JFK Collection to allow for further review before they are fully released to the public.

CURTIS E. GANNON
*Acting Assistant Attorney General*
*Office of Legal Counsel*